May it please the Court, my name is Muhammad Ghaz, I represent Vivian Wang, the appellant, counsel. I apologize, my case does not have a gun or knife, and I thought that was going to be boring enough, it doesn't even have a taser. So what we have is a civil dispute here, and not as exciting. Well, maybe a little variety for the students. Well, I suppose that everything that we hear is tragic to someone on some level, but they run the spectrum. Thank you. Maybe for the law students in the group also this would be interesting. This is a case of first impression on an issue that has not been decided by this circuit, and it involves the failure of Bear Stearns Securities and my client who purchased 150,000 shares of the securities in the days before the stock went from somewhere in the $60, $30 down to $2 to nothing. The question that's brought before you, Your Honor, is I've been listening, and I think you apply a lot of common sense, so I'm going to use a common sense example that I had not planned on using, but I think maybe it's appropriate. All of us agree that a customer has to pay for what they order and what they receive, and I hope all of us agree that a customer has to get what they ordered before they're required to pay for it. Now, if we had a case of apples, for example, someone orders a box of apples, Washington Red, and they get those apples in the mail, and what they get instead are mangoes, and they get a bill for apples. I think the argument would be if you didn't get apples, why would you pay for mangoes? Or a different case where you order apples and what you get is a box of rotten apples, and they're not the apples that you could consume or use for any purpose, and you're required to pay for it. So that's a little bit more complicated attenuation when you're dealing with the stock market and securities. Well, it's more complicated because it's perfectly clear that if they had ordered, say, General Motors stock before General Motors ran into trouble, they'd ordered General Motors stock thinking that it was worth X dollars, and it falls to Y before they pay. They didn't get what they wanted, but there's no question they owe the brokerage charges, is there? Well, ordinarily, I think you could separate those two things, and that's where our case kind of coalesces the two points. But you agree with that, then? I mean, they would still have to pay the brokerage charge in that case. Principally, yes. Of course they do. So what you're saying is because they were buying Bear's stock, Bear Stearns stock on the open market, I take it, they don't have to pay for it. I think your analogy was on target, but I think where we part ways, maybe, is where the contract comes in. And the clause that is at issue for interpretation before you is whether a stay of arbitration for the collection of the payment is going to cause a forfeiture. I'm trying to pursue your analogy to Apple's. Your argument would be because they bought Bear's stock on the open market, and Bear Stearns is not a nice company, just like maybe General Motors wasn't, but because it was Bear Stearns stock, and because they're buying from a Bear Stearns brokerage, now they don't have to pay for it. They would argue, never mind the arbitration for a moment, just trying to get your principles. That would be your argument? No, Your Honor. I think before they have to pay the price of those apples, you have to determine what the price is. That's what I'm arguing. Well, did your client purchase this Bear Stearns stock in a rapidly declining market with eyes open unsolicited, and the stock was in fact delivered and it's just never been paid for? Market risk is market risk. Everybody goes into the market with eyes wide open. When you go into the market with your eyes wide open in a declining market and you buy a stock that's under pressure, and during the course of this eight-day period, it was clearly under pressure and it was observable, and it wasn't a single purchase, it was five purchases over that period of time. Why shouldn't that margin account then be able to be closed and collected upon? And no one said it couldn't, and that's not the point, Your Honor. In the market, you and everyone else relies on the market information, and if the market information is false, if the market information is false, things are illegal. So when the price is published at $10, really it ain't worth $10, it's worth maybe $2. Well, that's where your class action comes in, and you're trying to say that it's encompassed and therefore should stay the arbitration, right? But she didn't pay for it, so how can she say she's out anything if she didn't pay for it and be a part of that class regarding those transactions? Well, that's a little bit of a smoke-and-mirror dichotomy, Your Honor. Well, I mean, it looks like they filed that class action just to defeat the arbitration agreement. Oh, no, Your Honor. There are a dozen or so class actions pending that were filed within days of Bear Stearns' collapse in New York, all dealing with this issue of the manipulation of the market and the market price. And her class action is the same ilk? I beg your pardon? Her class action is the same ilk as those others? She was a putative class member, Your Honor. She did not have her own class action. I thought that, was it her husband who filed the class action? Her husband. Her husband filed a direct class action. His class action was of the same ilk? Yes. Same issues. The issue was market manipulation and price manipulation. Thank you. And I failed to do this, but I'd like to reserve at least three or four minutes of my time for the rebuttal. Okay. Well, what if we agreed with your interpretation of the customer agreement and Bear Stearns wins the class action suit, what could Bear Stearns then do to recover the money that your client owes them? Go to arbitration and collect the money. That's the whole point. What you just said is precisely the point. Bear Stearns' argument has been that if you stay the proceedings in arbitration until those class actions are resolved, it causes a forfeiture, that their right is extinguished somehow. And that is an argument that makes no sense to me, hopefully makes no sense to you. A stay is a forbearance. The agreement that's at issue says if you forbear under this paragraph, no rights are waived. So all you're doing is delaying the timing. And what happens is in the interpretation of the agreement, I think this little exchange we've had, the price of those securities would have to be established. If there is fraud, if there is no fraud, whatever happened in those days leading to the collapse of Bear Stearns, if the price of those securities is actually in the marketplace not $30 and there was fraud, Mrs. Wang is entitled to rescission. Maybe the amount that could be sought from her is less. So there was good logic and reason to stay the arbitration, the agreement so required. And it's really that simple. So to say that it causes a forfeiture and have scared everyone into saying that Bear Stearns would be remedy-less. I have a question on the attorney's fees. Yes. Regarding the attorney's fees, how do you deal with the paragraph 12 in the customer agreement which provides that Bear Stearns may recover fees in parents for any litigation or proceeding involving your accounts? And so the arbitration, the arbiters give an amount and then the district court adds to that because your client, I guess right after the arbitration, files a lawsuit continuing to contest it. So they have to, in order to have it confirmed, they have to incur additional fees. So why doesn't that cover it? Because the arbiters obviously couldn't give that amount. It certainly seems related to the fact that your client continues to fight it. And if your client was wrong, then why wouldn't those fees be appropriate? Why doesn't that section allow for it? Well, several reasons. It doesn't because if we're abiding by the agreement, the agreement says what it says and the arbitrators do it. And in this case even, the record actually itself shows that the arbitrators even prospectively had awarded things for post-arbitration paperwork that was prepared. So if the fees are only awardable in arbitration, and I think we've briefed all of this, and between everybody in this room, that's not the sexiest part of this case. And I just see that section. Well, I know, but since we have a class here, you never tell the judge that their question isn't a good question. Oh, no, of course not. Because it may be the sexiest part of the case for me. I understand. I think the statutory enabling section just does not say it. If you interpret that it does include post-arbitration award of fees. What statutory enabling section? You mean the Federal Arbitration Act? Correct. What's that got to do with it if they've contractually agreed to pay them? Well, I think we're talking about when you go to court to get an arbitration award confirmed and the agreement itself says that the arbitrators award the attorney's fees, can the court then award attorney's fees on top of it? And I don't see a direct authority that allows the court to add to those fees. Common sense, you might argue, and maybe many other circumstances get there, but if we're using the contract as a mooring, the contract says the arbitrators do it. So you think they should go back to the arbitrator and ask for those fees? Well, I think we're talking about strict construction would require something like that, and I'm not a fan of waste, but if we're dealing with construction of agreements as written, which kind of brings me to this other point about FINRA and the financial. And then when the arbitrator awards them, then what do you do? You go back to the district court and say, we ask you to not confirm the award of those fees, and the district court says, no, I'm going to confirm it, and then you go back to the arbitration again to get the fees for the fees. Is that your theory of how they should proceed? It's not my theory, but that's the reality I think that you may confront. I think I'm on that side of the ledger with you that some of this stuff makes sense, and here we are. But the point in terms of construction of the agreement is if we're looking at what makes sense and we're trying to avoid exactly the kind of scenario Your Honor is pointing to, this provision in the agreement said stay the litigation in the arbitration forum, all other litigation practically, and wait for those class actions to be over with, no harm, no foul. And most of this stuff would not have happened, and we would have had a clear path to the end of the case. Do you want to, you have like a little over three minutes. Do you want to reserve the balance? Thank you very much. Good morning, Your Honors. May it please the Court. Good morning. Jeffrey Goldberg on behalf of the appellee. The first thing I would like to talk about is the context in which we need to approach the construction of the provisions at issue in this case with respect to arbitrability, namely section 23A of the customer agreement and the FINRA rule on the subject, which the parties conceded at the district court level are materially the same. And we need to approach this with the understanding that the parties have a valid and enforceable arbitration agreement, and they have agreed to arbitrate any and all disputes arising under or relating to Ms. Wang's brokerage account with Bear Stearns. So what we have in the provisions is a limited carve-out from that broad arbitration agreement. And the Supreme Court has instructed in the Mitsubishi Motors Corp case, quoting its previous statement in the Moses H. Cone Memorial Hospital case, that as a matter of federal law, any doubts as to arbitrability must be resolved in favor of arbitration. Do we have to decide the issue here as to whether the arbitration panel had the authority to determine its own jurisdiction, or can we just affirm the district court's decision without addressing that issue? Well, I believe that this court need not get to the issue of the construction of the provisions and whether or not dependent imputative class actions precluded the arbitration from going forward, because, in fact, the arbitrators did have the authority to decide this issue in the first instance, and that's true for two reasons. First, the parties' customer agreement evidences a clear and unmistakable intent to give the arbitrators that authority. And this is because there is a FINRA rule precisely on this subject. There is a similar FINRA rule, Rule 12.4.13, that says the arbitrators have the authority to interpret and determine the applicability of all provisions under the Code. So when you have a FINRA rule acknowledged to be materially the same as the provision in the customer agreement that governs this precise situation, and you have a rule that says the arbitrators determine whether it's applicable, that is clear and unmistakable intent. And courts that have construed the identical FINRA rule under the Industry Code have concluded that the effect of these two rules is, in fact, to confer that authority on the arbitrators. That would be in the Bainis case out of the Southern District of Newark, that, as we noted in our Rule 28J letter, was recently affirmed by the Second Circuit, as well as the Wright decision out of the Eastern District of California. And there's also various other circuit opinions in accord that, again, hold where the parties incorporate, by reference, rules which confer authority on arbitrators to decide arbitrability issues. That gives the arbitrators the ability to determine that, and it precludes an independent judicial review of the arbitrability issue. The second reason why the court need not reach the construction of the provisions is because Ms. Wang ultimately submitted this issue to the arbitrators. And she didn't argue it once, she didn't argue it twice or three times, she argued the issue four times, and insisted upon submitting the issue on the merits to the arbitrators. And we quoted in our brief, there was a quote from Ms. Wang's counsel of the arbitration that conceded that only if the arbitrators did not reach a decision that Ms. Wang agreed with, would she, at that point, seek a court determination. And this court's opinion in George Day clearly says that there are steps that a party needs to follow to raise and preserve an objection to arbitrability. And they are not to submit the issue for decision to the arbitrators. And if they, in fact, do so, they forego the ability to seek an independent judicial review. Well, if you're saying, if our only role under the Federal Arbitration Act and the customer agreement is to confirm or vacate the arbitration award, how can the district court then modify the award by granting more attorney's fees? Well, the award was not modified. The order granting Bear Stearns attorney's fees and costs was issued post-judgment. The judgment did nothing other than confirm what the arbitrators had set forth in the award. But you're relying on the arbitration agreement for that, correct? Well, you're relying on the customer agreement. And the customer agreement, in fact, explicitly anticipates that there will be post-arbitration court proceedings. It says that you can go to any court with jurisdiction to confirm the judgment. So where the parties have contractually agreed that if there is a debit balance left due knowing which there was in this case, and if the brokerage firm needs to pursue remedies to obtain payment, it's entitled to recover its attorney's fees and costs. And so that basis is not, as Judge Fernandez pointed out, does not come from the FAA. It is, in fact, a matter of contractual agreement. So getting back to the provisions at hand, Appellant's counsel says the solution to this is after the class actions are resolved, then Bear Stearns can go to arbitration. But if we look at the language at issue, that's not what Section 23A says. The provision provides that a party cannot enforce the arbitration agreement against a putative class member with respect to claims encompassed by the class action until one of three enumerated events occurs. That's the class is denied, the class is decertified, or the member is excluded from the class. So what this means is in any of those three instances, the party is not going to be bound by the resolution of the class action. So at that point, it makes sense. The arbitration can proceed. However, what happens if none of those three events occurs? The class action proceeds to resolve on the merits. Nothing in that provision says that arbitration can then go forward at that point. So we must know from the language itself that it presumes that claims encompassed by the class action will, in fact, be resolved in the class action. And so we would submit that Appellant's interpretation leaves a party to a valid and enforceable arbitration agreement potentially without an arbitration remedy if the class is, in fact, certified and never decertified and the party is not excluded from the class. And we would submit that under, again, the clear liberal federal policy favoring arbitration, that a construction of the language that leaves a party to an arbitration agreement without an arbitration remedy cannot be the proper construction. So does Bear Stearns across the board interpret the agreement to mean that the hypothetical that I put forward that if you went forward and that the action went forward that then you couldn't arbitrate it? I'm just not sure you're not making that interpretation and someone else from Bear Stearns in another case would come back after the class action went forward and said, oh, well, now we're going to arbitrate. Well, I think that situation is avoided by a proper construction of the language. And again, the language by enumerating only three conditions that will allow the arbitration to proceed, that tells you what it means for a claim to be encompassed by a class action. And after all, I mean, that's the key question in this case. That's what the district court noted. And encompassed by must mean it's going to be resolved by the class action. And if the provision is interpreted correctly, we're not faced with that situation. I believe Judge Callahan also made an excellent point that if we step back, how can Ms. Wang even be a member of a class with respect to the trades that she hasn't paid for? She suffered no injury, in fact. She has no standing with respect to those trades. And it's important to note that the only claims that Bear Stearns ever asserted against Ms. Wang in arbitration were with respect to the debit balance that was due an owing. They never sought to compel Ms. Wang to arbitrate any claims with respect to transactions that she authorized and, in fact, paid for. It's also important to note, and this goes back to Judge Fernandez's hypothetical about General Motors, the class actions that were filed following the sale of Bear Stearns to J.P. Morgan Chase were filed against the publicly traded holding company, the Bear Stearns Companies, Inc. The party in the arbitration, the party to this appeal, is Bear Stearns and Company, Inc., the brokerage firm. And so a resolution of class actions against the publicly traded holding company cannot and will not adjudicate whether the brokerage firm is entitled to collect the debit balance. Surely if the class action is unsuccessful and the Bear Stearns Companies, Inc. are not found liable for securities fraud, that's not going to ensure payment to Bear Stearns. And even if there were some securities fraud finding on behalf of the Bear Stearns Companies, Inc., the publicly traded company, that does not relieve Ms. Wang of her contractual obligation to pay her brokerage firm for the trade she authorized. And this is important to note. The only action that was filed that included the brokerage firm as a defendant was the action that Roger Wang filed. And that action was filed as a strategic maneuver after Bear Stearns filed the arbitration against Ms. Wang. And the Bayness case in the Southern District of New York, again affirmed by the second judgment, and the Wright case out of the Eastern District of California said, you cannot use the FINRA rule as a sword. And in fact, the only actions that are relevant for purposes of concerning the provision are the actions that are pending at the time that the arbitration is filed. So for these reasons, neither Section 23A of the Customer Agreement nor the FINRA rule in the subject precluded Bear Stearns from moving forward with its collection claims because those claims were not encompassed by any class actions that were pending at the time. Ms. Wang also argues, and just to get back to why, in fact, the class actions will not resolve Bear Stearns' collection claims, I already spoke to the fact that the brokerage firm is not a party to those class actions. Bear Stearns can't assert a counterclaim. Even if it wanted to specially intervene to do so, the law is clear that Bear Stearns can't bring a counterclaim against an absent class member. And Ms. Wang is not a named plaintiff in any of the class actions. So again, we have Bear Stearns with no remedy in the class action, which further supports the argument that the collection claim must not be encompassed by the class actions when, in fact, Bear Stearns cannot attain a remedy in the class action. Ms. Wang also argued that her defenses rendered the claim unarbitrable, and that's not the case either. If you look at the plain language of the provisions, it refers to claims. It does not refer to defenses. And again, whether there was any fraud on the part of the holding company would not in any event provide a defense to payment of the brokerage firm Bear Stearns. And I would note that the entire weight of authorities that have construed the provisions at issue supports Bear Stearns' position. Ms. Wang has not cited a single case on point otherwise. We have the Canning case out of the Middle District of Tennessee, the 2007 decision cited by the district court in its order. That relied on, in part, the Liberte decision out of the Sixth Circuit, an unpublished opinion, as well as the Jolly case out of the Southern District in New York, which said the fact that there may be potential offsets between an arbitration and a class action does not mean that the arbitration is encompassed by the class action. And then again, I mentioned, subsequent to the district court's orders, we have the Wright decision out of the Eastern District of California, as well as the related Bates decision, also out of the Eastern District of California, and the Banas decision out of the Southern District of New York, affirmed recently by the Second Circuit. And all of these cases that have looked at either similar or identical language in the industry code have construed these provisions in the same way that Bear Stearns construes these provisions, and that is one that respects and acknowledges the liberal federal policy favoring arbitration. The judgment should be affirmed. Thank you. Thank you. There do not appear to be additional questions. Thank you. Thank you. Thank you, Your Honor. I think the idea that you should not interpret the language is troubling to me because the issue here is exactly the interpretation of the contract and everything revolves around it. And the courts in one form or another have come across this language, but they have not really interpreted it. And when you do, if you look at it, there are two parts. There is a part where a plaintiff goes into an arbitration form and takes a class action claim in it, which is part one of the agreement, says you can't do that. The second part of the agreement is when, on the defense side, class action claims in disguise are brought into an arbitration form and the defense says, oh, wait a minute, you can't force me to litigate in reverse, by way of my defenses, for example, in this case, of securities fraud, those class action issues. So I think the interpretation is necessary to clarify, and there is no law in Ninth Circuit. There is a case that I think Justice Erickson presided over some time ago. That's Ingstad v. Grant Thornton. I found this last night somehow when I was looking. It's 2006, I'm sorry, it's 2006 Westlaw 3751204, and in that case. So are you urging this court to publish in this matter? I am urging the court to publish in this matter. And to publish what? Publish the interpretation of this paragraph that appears in many, many, many contracts in this country, including in the Ninth Circuit, and define the meaning that's given to those phrases so people are not guessing. And in order to understand my point, a claim has a flip side, which is a defense. So if you take the claim into an arbitration form, do you leave out the defenses at the door? It's just a one-way street. And how do you interpret that with common sense to say, should we say things in an arbitration form to let the class actions that encompass those claims go on? And I think that is a fair interpretation to give it. To the point that Your Honor made in terms of Mrs. Wang's payment, if you look at the record, the total amount of securities charged was $6.5 million. We're dealing with a $2.7 million balance after liquidation. It's not a cancellation transaction. Bear Stearns went ahead and liquidated the account and took the money and sued. So legal rights of Mrs. Wang were secured in place. And so far as this other issue, as far as the district court's finding of non-waiver, whether you should ignore that, I think we addressed that in the brief, that the standard is clear error. And that was a factual finding. Waiver is an intentional relinquishment of an own right per Waller decision in California. And the district court made a factual finding. And they're arguing it naked on appeal that you should ignore the district court's factual finding. The final point I'd like to make, Your Honor, is the forum issue. And, again, that's a technical issue. I think we've briefed it. But when you look at the forum that was chosen in the agreement, that was FINRA, Inc., itself. And everything that happened in this case was somehow or other by an entity called FINRA Dispute Resolution, a separate corporation. There was no agreement. Some of this stuff, again, goes back to this idea of common sense that, you know, how do you parcel these things so we don't waste time and money? And I would submit, Your Honor, at the end of the day, to determine what is a fair price to pay for the apples that I mentioned in the beginning is the right thing to do. And you wait until the air clears, the class actions get decided. If Bear Stearns wins and there was no fraud, road is clear. If Bear Stearns loses those and has a roadblock that has to collect less or none, well, it shouldn't have committed fraud in the first place. And then that's a different story. All right. You've gone in. You've exceeded your time. Thank you very much. So I'll ask you to conclude. Thank you. The court, this matter will stand submitted. The court now is in recess, and we are going to conference. As I've indicated, Judge Erickson and I will return after conference to meet with the class, obviously not discuss the cases that we've heard today, but just in terms of general appellate work. I think that there were two options that the class, whether they're going to, there was a possible tour that we were going to contact if they wanted to take a tour of the courthouse. Or you may want to, one of the, someone from the clerk's office said someone's ready to do that with them, if that's the case. Or you can remain in the courtroom and wait for us to return. And also, I think that Mr. Shickley was available to talk to the class if he wanted. So the court's in recess at this point. Thank you. All right.
judges: Erickson, Fernandez, Callahan